# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **LC WEST CHESTER LLC** | : | **CIVIL ACTION** |
| *Plaintiff* | : | |
| | : | **NO. 19-3656** |
| **v.** | : | |
| | : | |
| **PL REAL ESTATE LLC** | : | |
| *Defendant* | : | |

NITZA I. QUIÑONES ALEJANDRO, J.                                    JANUARY 18, 2022

# MEMORANDUM OPINION[1]

**INTRODUCTION**

In this civil action, Plaintiff LC West Chester LLC ("Plaintiff" or "LC West Chester") claims that Defendant PL Real Estate LLC ("Defendant" or "PL Real Estate") breached a valid and enforceable commercial real estate purchase agreement and seeks either specific performance of the sale of the commercial property or, in the alternative, monetary damages. [ECF 5]. Defendant contends that the parties did not enter into any such contract.

The case proceeded to a bench trial before this Court. Following the presentation of the evidence, the parties submitted proposed findings of fact and conclusions of law. [ECF 37, 38]. Defendant also submitted a response. [ECF 39]. In reaching its findings of fact and conclusions of law, this Court has considered the parties' filings and the trial testimony, and has assessed the credibility of the witnesses. For the reasons set forth herein, this Court finds that Plaintiff has failed to prove by a preponderance of evidence that the parties entered into any valid commercial sale/purchase agreement for Defendant's property. Accordingly, judgment will be entered in favor of Defendant and against Plaintiff pursuant to Federal Rule of Civil Procedure 58.

---

[1]      This Memorandum Opinion sets forth the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

**FINDINGS OF FACT**

Based on the evidence presented at the bench trial and after considering the parties' post-trial submissions, this Court makes the following findings of fact:[2]

Defendant PL Real Estate is a limited-liability company owned by brothers Augusto and Antonino Mandara.  Augusto Mandara testified that he makes all decisions for the company, sometimes in consultation with his brother.[3, 4]  In 2016, PL Real Estate purchased the land and commercial building located at 1159 Wilmington Pike in West Chester, Pennsylvania, the subject property in this dispute (the "Property"), for $2,150,000 and financed the purchase with a mortgage and loan.  The commercial building on the property is currently leased by TD Bank, N.A. ("TD Bank").[5]  PL Real Estate uses the rental payments made by TD Bank to pay the mortgage, which, at the time of the trial, had a balance due of approximately $1,000,000.[6]

In 2018, Antonino Mandara suffered a stroke (and has since recovered).  Concerned about the family finances in the wake of his brother's health issues, Augusto Mandara ("Mandara") considered selling the Property.[7]  On October 10, 2018, Mandara, on behalf of PL Real Estate,

---

[2]    The following evidence was presented at trial: the trial testimony of David Laiter, Augusto Mandara as-on-cross, Donald J. Weiss, and Louis B. Colameco, III, as witnesses for Plaintiff LC West Chester; the trial testimony of Augusto Mandara as a witness for Defendant PL Real Estate; excerpts from the deposition testimony of David Laiter, Augusto Mandara, Donald J. Weiss, and Louis B. Colameco, III; copies of email messages sent between David Laiter and Donald J. Weiss; text messages sent between David Laiter and Augusto Mandara; the listing contract between PL Real Estate and Equity Retail Brokers; letters of intent; and draft agreements of sale.

[3]    Trial Tr. for Oct. 6, 2021 ("TT2") 5:2–3.  Mandara also owns and manages a restaurant business in his home borough of Staten Island, New York.  *Id.* 4:1–6.

[4]    For purposes of this opinion, Defendant PL Real Estate and Mandara are deemed one and the same.

[5]    *Id.* 5:19–20.

[6]    *Id.* 5:16–25.

[7]    *Id.* 6:1–9.

entered into an exclusive listing contract (the "Listing Agreement") with Equity Retail Brokers ("Equity") for real estate brokerage services.[8]   Equity is a full-service commercial real estate brokerage firm specializing in investments, sales, leasing, and property management.[9]   David Laiter ("Laiter") and Edward G. Ginn ("Ginn"), the licensed real estate brokers for Equity, agreed to represent PL Real Estate in listing and selling the Property.[10]

The Listing Agreement provided, *in part*:

> **AGREEMENT**
>
> 9. . . . Owner [PL Real Estate] hereby gives the Agent [Laiter and Ginn on behalf of Equity] the sole and exclusive right to market the said premises until terminated. . . .
>
> **EXCLUSIVE RIGHT TO SELL**
>
> 10.   Owner agrees that at any time during the term of this Agreement, Agent shall have and is hereby given the exclusive right to negotiate such sale or exchange, and regardless of who may negotiate such sale or exchange, Owner shall recognize Agent as the sole moving, efficient, and procuring cause of such sale or exchange and shall pay to Agent a commission.[11]

Laiter, the primary agent working on the listing for the property, testified that he understood that the Listing Agreement did not confer on him or Equity any right to accept, on Defendant's behalf, any purchase offers.[12]   Laiter further acknowledged that the Listing Agreement only gave him the exclusive right to market the Property and negotiate a sale.[13]

---

[8]      Pl.'s Ex. P-1 at p. 1.

[9]      Trial Tr. for Oct. 5, 2021 ("TT1") 18:23–19:1.

[10]     Pl.'s Ex. P-1 at p. 1.

[11]     *Id.* at p. 2.

[12]     TT1 50:5–8.

[13]     *Id.* 23:25–24:3, 24:19–21.

The Listing Agreement indicated the listed sale price for the Property as $2,260,000.[14] Prior to signing the Listing Agreement, Mandara advised Laiter that he would not consider an offer to buy the Property for any amount less than $2,150,000, the price he paid for the property in 2016.[15] Mandara also expressed his concerns to Laiter regarding a possible prepayment penalty on the mortgage/loan on the Property.[16]

Plaintiff LC West Chester is a limited-liability company owned and operated by Louis B. Colameco, III ("Colameco"), a commercial real estate investor.[17, 18] Colameco formed LC West Chester shortly before December 18, 2018, for the specific purposes of purchasing and, potentially, owning the Property.[19] In his investment dealings, Colameco relies on the advice and assistance of Donald J. Weiss ("Weiss"), a licensed certified public accountant, attorney, and real estate broker.[20] Weiss, the broker of record for Chadds Ford Realty LLC ("Chadds Ford"), considers himself to be well-versed in real estate transactions.[21] Colameco has known and worked with Weiss for over twenty years.[22]

---

[14]    Pl.'s Ex. P-1 at p. 2.

[15]    TT2 11:11–12:1.

[16]    TT1 75:8–10; TT2 21:7–12.

[17]    TT1 161:5–7, 162:12–13.

[18]    For purposes of this opinion, Plaintiff LC West Chester and Colameco are deemed one and the same.

[19]    *Id.* 173:21–25.

[20]    *Id.* 112:15–23, 161:11–13.

[21]    *Id.* 139:5–18.

[22]    *Id.* 161:14–17.

In the fall of 2018, Weiss became aware that the Property was listed for sale.  He informed Colameco of the listing, and Colameco indicated an interest in purchasing it.[23]  On December 18, 2018, an attorney for Chadds Ford prepared a Letter of Intent to Purchase Real Estate (the "Letter of Intent") with an offer from LC West Chester to purchase the Property from PL Real Estate at a price of $1,980,000.  The Letter of Intent set a due diligence period for the sale at forty-five (45) days following the signing of an agreement of sale, set a settlement date of sixty (60) days following the signing of an agreement of sale, and made reference to a $50,000 deposit.[24] Colameco, on behalf of LC West Chester, signed the Letter of Intent on December 18, 2018.[25]

On December 19, 2018, Weiss, on behalf of LC West Chester, sent the Letter of Intent via email to Laiter and Ginn.[26]  Later that same day, Laiter informed Mandara via email of LC West Chester's offer of $1,980,000 and an offer from another potential buyer.  In the email, Laiter attached the Letter of Intent, and asked Mandara to confirm that the $2,150,000 figure previously discussed was still the absolute minimum price at which Mandara would sell the property.[27]

On December 28, 2019, Mandara responded via email to Laiter indicating that he would call Laiter the following week.[28]  Around the first week of January 2019, Laiter and Mandara spoke on the telephone.[29]

---

[23]     *Id.* 115:3–7, 117:5–21.

[24]     Pl.'s Ex. P-2 at p. 3.

[25]     *Id.* at p. 4.

[26]     *Id.* at p. 1.

[27]     Pl.'s Ex. P-3 at pp. 1–4.

[28]     Pl.'s Ex. P-4 at p. 2.

[29]     TT1 29:15–19.

On January 7, 2019, Laiter sent an email to Weiss indicating, "I just spoke with [Mandara]. The lowest he is willing to go is $2.15 M.  Let me know if your client is interested in meeting him at this price."[30]  Weiss testified that he viewed Laiter's email as a "counteroffer."[31]  That same day, Weiss and Colameco communicated via email regarding the Property and Laiter's email of January 7.  Colameco advised Weiss to accept the asking price of $2,150,000.[32]

On January 8, 2019, Weiss emailed Laiter, "OK, he'll [Colameco] do that price," and asked Laiter to change the price on the Letter of Intent and have Mandara initial and sign the Letter of Intent.[33]  Laiter agreed to the request.[34]  However, neither Laiter nor Mandara ever changed or signed the Letter of Intent or sent a revised version of the Letter of Intent to Weiss or Colameco.[35]

On January 9, 2019, Laiter sent a text message to Mandara asking whether a due diligence period of forty-five (45) days and a closing period of sixty (60) days would work for him.  Mandara responded by telling Laiter to "Hold off On it."[36]  Mandara testified that he wanted Laiter to "hold off" on the sale of the Property because he needed to get more information regarding any prepayment penalties owed and the possibility of being able to complete an exchange[37] under

---

[30]     Pl.'s Ex. P-5 at p. 1.

[31]     TT1 121:1–7.

[32]     Pl.'s Ex. P-6 at p. 1; TT1 165:12–25.

[33]     Pl.'s Ex. P-7 at p. 1.

[34]     *Id.* at p. 2.

[35]     TT1 58:16–59:7.

[36]     Def.'s Ex. D-4 at p. 1.

[37]     Under 26 U.S.C. § 1031, a seller of investment property may defer capital gains on the taxable proceeds of the sale of the property if the seller then uses the proceeds to purchase a similar property. *Germinaro v. Fid. Nat'l Title Ins. Co.*, 2017 WL 680001, at *2 (W.D. Pa. Feb. 21, 2017), *aff'd*, 737 F. App'x 96 (3d Cir. 2018).

§ 1031 of the Internal Revenue Code.[38]  Mandara explained that he wanted to complete a § 1031 exchange to avoid incurring substantial tax liability.[39]  Laiter testified that he understood the message to mean that Mandara was asking him to pause the discussions with Weiss regarding the potential sale of the Property.[40]

On January 16, 2019, Mandara again asked Laiter via text message to "please hold off."[41]  As with the January 9, 2019 text message, Mandara testified that he meant to convey that he wanted to hold off on selling the Property.[42]  In turn, Laiter testified that he understood the message to mean that Mandara wanted him (Laiter) to put on hold any further negotiations with Weiss regarding a potential sale of the Property.[43]

On January 23, 2019, Weiss asked Laiter for a copy of the TD Bank lease agreement.[44]

On January 28, 2019, Weiss emailed Laiter, "I want to order title insurance," asked Laiter where to send the deposit, and asked about the status of the updated Letter of Intent.[45]  Laiter responded on the morning of January 30, 2019, with instructions regarding the title insurance and informing Weiss that he had "had a hard time getting a hold of [Mandara] this week."[46]

---

[38]     TT2 12:22–13:5.

[39]     *Id.* 22:7–13; Def.'s Ex. D-12.

[40]     TT1 63:5–15.

[41]     Def.'s Ex. D-4 at p. 3; Def.'s Ex. D-28 at p. 8.

[42]     TT2 14:9–15.

[43]     TT1 66:23–67:5.

[44]     Pl.'s Ex. P-9 at p. 4.

[45]     *Id.*

[46]     *Id.* at p. 1.

Later that afternoon (January 30, 2019), Laiter emailed Weiss: "Just got off the phone with the seller.  He is interested in moving forward."  Laiter testified that "moving forward" meant "negotiating further" and that he believed at that time that Mandara "still hadn't decided to sell" the Property.[47]  Laiter went on to explain to Weiss that Mandara wanted to shorten both the due diligence and the closing periods to thirty (30) days, and he asked Weiss whether the changes would work for his client.[48]  Weiss responded that day agreeing to the changes and again asked again about receiving a copy of the TD Bank lease and whether arrangements could be made to inspect the Property.[49]  Later that same afternoon, Laiter emailed Weiss and attached a copy of the TD Bank lease agreement.  In the email, Laiter instructed Weiss to send the deposit check to the title company and indicated, "Per the LOI [Letter of Intent] submitted, please begin drafting the Agreement of Sale."[50]

On February 6, 2019, Laiter followed up with Weiss regarding the status of the draft agreement of sale.[51]  He also emailed Mandara and attached the updated Letter of Intent, which had been revised to reflect the sale price of $2,150,000.[52]

---

[47]     TT1 69:1–14.

[48]     Pl.'s Ex. P-9 at p. 1.

[49]     Pl.'s Ex. P-10 at p. 1.

[50]     Def.'s Ex. D-7 at p. 1.

[51]     *Id.*

[52]     Pl.'s Ex. P-11 at p. 1.

On February 11, 2019, Weiss sent Laiter a copy of the title report he had ordered for the Property, which was dated February 10, 2019.[53]  Later that same day, February 11, 2019, Weiss wrote to Laiter asking whether he and Colameco could inspect the Property on February 22.[54]

At some point before February 12, 2019, Weiss drafted an agreement of sale (the "Draft Agreement of Sale").[55]  On February 12, 2019, Weiss sent Laiter an unsigned copy of the Draft Agreement of Sale.[56]  The document listed the sale price as $2,150,000.[57]  It also included, *inter alia*, provisions regarding fixtures and personal property, zoning, financing contingencies and waivers, the seller's representations and warranties, municipal requirements, a tax-deferred exchange, the buyer's due diligence and inspections, maintenance and risk of loss, broker indemnification, recording, assignments, governing law, venue, jurisdiction, arbitration, default, termination and return of deposits, and a release.[58]  In the email, Weiss also indicated, "I will have [Colameco] sign and send to you. Can you get [Mandara] to sign."  Weiss further reiterated that he and Colameco were interested in inspecting the property the following week and that he would send a deposit to a title company "on Thursday in hopes we get a signed agreement of sale."[59]

---

[53]     Pl.'s Ex. P-12 at p. 1–2.

[54]     Pl.'s Ex. P-13 at p. 1.

[55]     TT1 152:24–153:10.

[56]     Def.'s Ex. D-8 at p. 1.

[57]     Def.'s Ex. D-9 at p. 2.

[58]     *Id.* at pp. 2–8.

[59]     Def.'s Ex. D-8 at p. 1.

Laiter forwarded the Draft Agreement of Sale to Mandara that same day, asking Mandara to have his attorney review it.[60]   Mandara testified that he would never agree to a sale of the Property without first having an attorney or accountant review the relevant documents.[61] However, Mandara had neither his attorney nor his accountant review the Draft Agreement of Sale or the Letter of Intent regarding the Property.[62]

On February 15, 2019, Laiter emailed Weiss regarding Weiss' request to inspect the Property.  He also inquired of Weiss, "if there are prepayment fees, and they are reasonable, would your client be willing to split them?  We do not know what they are (if any), but just wanted to see if your client would be open to it."  Thereafter, Weiss responded regarding the inspection and noted, "As to the prepayment, let's see."[63]

Later that same day, Laiter again emailed Weiss and explained that Mandara would check with his bank "as soon as possible" regarding any prepayment penalties he might incur upon sale of the Property.  Weiss responded that afternoon, informing Laiter that the deposit had been sent to the title company.[64]

In the morning of February 18, 2019, Laiter emailed Mandara to let him know that Colameco and Weiss were interested in inspecting the Property.[65]   Mandara responded that he did

---

60   *Id.* at p. 2.

61   TT2 24:11–13.

62   *Id.* 24:3–10.

63   Def.'s Ex. D-10 at p. 2.

64   *Id.* at p. 1.

65   Pl.'s Ex. P-15 at p. 1.

not have any concerns with allowing the inspection.[66]  That same day, Weiss asked Laiter, "Can we get a signed AoS [agreement of sale] back?"[67]  Later that evening, Weiss again emailed Laiter asking about the possibility of an inspection.  During his testimony, Laiter explained that, in his experience, property inspections usually take place *after* an agreement of sale has been signed by the buyer and seller.  However, Laiter believed that Weiss' request for an inspection was an attempt by Colameco to "push the deal forward."[68]  In response to the email, Laiter told Weiss that he would have to check with TD Bank's protocol before confirming.[69]  Weiss then advised Laiter that he had deposited $50,000 with a title company and that Colameco would be ready to settle by March 10, 2019.[70]

On February 20, 2019, Laiter emailed Weiss regarding the Draft Agreement of Sale.  He explained that because Mandara was interested in completing an exchange under § 1031 of the Internal Revenue Code, Mandara needed to check with his attorney and accountant before signing the Draft Agreement of Sale.  He also indicated that there was "no issue" with an inspection of the exterior of the building on the Property but that Colameco would need clearance from TD Bank for an inside inspection.  Laiter indicated that Mandara was not going to request clearance for an inside inspection at that time because TD Bank was responsible for any issues inside the building.[71]

---

[66]     TT1 106:16–22.

[67]     Def.'s Ex. D-11 at p. 1.

[68]     TT1 77:19–25.

[69]     Pl.'s Ex. P-14 at p. 1.

[70]     *Id.*

[71]     Def.'s Ex. D-12 at p. 1.

Weiss responded that afternoon, explaining that he knew someone at TD Bank and he had asked her about walking through the building.[72]

After receiving Weiss' email regarding his contact at TD Bank, Laiter sent a text message to Mandara asking whether Colameco and Weiss could "walk through the building."  Mandara responded, "Don't think it's a problem."[73]

On February 22, 2019, Colameco and Weiss visited the Property and walked around the inside of the TD Bank.[74]  Afterward, Weiss emailed Laiter that the inspection "went well."  In the same message, Weiss asked Laiter if he knew of other bank properties listed for sale in the area, and added, "If your client decides not to sell then we are looking at others."[75]  Weiss testified that he sent this message because he thought Mandara might decide not to sell the Property.[76]  In response, Laiter emailed Weiss, listing a few other properties that Weiss and Colameco could consider as alternatives to the Property.[77]

On March 8, 2019, Weiss asked Laiter if he had heard from Mandara regarding the sale and mentioned that Colameco was ready to settle.  Laiter then told Weiss he had "not been able to get a hold of him yet" but that he had made Mandara aware that Colameco was ready to close.[78]

---

[72]     Def.'s Ex. D-13 at p. 1.

[73]     Pl.'s Ex. P-16 at p. 1.

[74]     Pl.'s Ex. P-17 at p. 1.

[75]     Def.'s Ex. D-14 at p. 1.

[76]     TT1 156:1–4.

[77]     Def.'s Ex. D-15 at pp. 1–2.

[78]     Pl.'s Ex. P-18 at pp. 1–10.

Weiss testified that at this point, he wanted to move forward with the sale but did not believe there was "enough of an agreement that [Colameco] could go to court on."[79]  To encourage the sale, Weiss and Colameco decided to offer Mandara the full listing price for the Property.  On March 9, 2019, Colameco signed and initialed a new draft agreement of sale (the "New Draft Agreement") at the full listing price of $2,260,000.[80]

After Colameco signed the New Draft Agreement, Weiss emailed Laiter the New Draft Agreement, writing, "Attached is a full price offer.  Will that get [Mandara] to sign ?"  Colameco was copied on this email.[81]  Laiter forwarded the New Draft Agreement to Mandara via email and asked Mandara, "Do you know if you are able to sell the property or not?"[82]  Laiter testified that he did not receive a response from Mandara.[83]

On March 19, 2019, Weiss wrote to Laiter, "any word?  we really must move on.  It looks like he just doesn't want to sell."[84]  Colameco testified that he believed that Mandara did not want to sell the Property.[85]

In their testimonies, Colameco, Weiss, and Laiter acknowledged that they never had any discussion about creating an enforceable agreement of sale through email communications.[86]  Instead, Laiter always understood that any sale would be reflected in a signed, written agreement

---

[79]    TT1 158:8–13.

[80]    Def.'s Ex. D-17 at p. 1.

[81]    Pl.'s Ex. P-18 at p. 1.

[82]    Def.'s Ex. D-16 at p. 1.

[83]    TT1 84:14–16.

[84]    Def.'s Ex. D-18 at p. 1.

[85]    TT1 183:7–9.

[86]    *Id.* 87:2–16, 143:19–144:8, 175:18–176:7.

of sale.[87]   Similarly, Weiss expected that any sale would be reflected in a signed letter of intent followed by a written agreement of sale signed by Colameco or a person on his behalf.[88]

Mandara testified that he never communicated with Colameco or Weiss before this lawsuit commenced.[89]

## CONCLUSIONS OF LAW

The primary and dispositive issue before this Court is whether Plaintiff has established, by a preponderance of evidence, that the parties entered into a valid and enforceable contract for the sale of the Property.  Defendant disputes the existence of a binding contract, contending that the parties never reached an agreement as to the essential terms of the contract, that Laiter did not have the requisite authority to bind Defendant to a contract, and, further, that the Statute of Frauds prohibits enforcement of any contract formed between the parties.  For the reasons that follow, this Court finds that Plaintiff has not met its burden of proof in establishing a valid and enforceable agreement for the sale of the Property.

### *Existence of a Contract*

To prevail on a claim of breach of contract, a plaintiff must establish: "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract[,] and (3) resultant damages."  *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003) (quoting *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)).  Generally, for a valid contract to exist, there must be an offer, an acceptance, and consideration.  *Muhammad v. Strassburger, McKenna, Messer, Shilobod & Gutnick*, 587 A.2d 1346, 1349 (Pa. 1991).  The

---

[87]   *Id.* 87:9–13.

[88]   *Id.* 142:15–22.

[89]   TT2 19:15–24.

parties to the agreement must manifest an intent to be bound by its terms, which must be sufficiently definite to be enforced. *Channel Home Ctrs., Div. of Grace Retail Corp. v. Grossman*, 795 F.2d 291, 298–99 (3d Cir. 1986) (citing *Lombardo v. Gasparini Excavating Co.*, A.2d 663, 666 (Pa. 1956)). That is, there must be a "meeting of the minds." *Refuse Mgmt. Sys., Inc. v. Consol. Recycling & Transfer Sys., Inc.*, 671 A.2d 1140, 1146 (Pa. Super. Ct. 1996). A contract may be formed before the creation of a formal document "[i]f the parties agree on essential terms and intend them to be binding." *Krause v. Great Lakes Holdings, Inc.*, 563 A.2d 1182, 1186 (Pa. Super. Ct. 1989) (citing *Johnston v. Johnston*, 499 A.2d 1074 (Pa. Super. Ct. 1985)). However, no contract exists "where the parties contemplate that their agreement cannot be considered complete before it is reduced to writing." *Id.* (citing *Essner v. Shoemaker*, 143 A.2d 364 (Pa. 1958)). Such is the case here.

Here, the parties agree that they never executed a formal, written agreement for the sale of the Property. In fact, the evidence of record and the credible trial testimony clearly establish that Weiss, Laiter, Colameco, and Mandara each believed that their discussions regarding the sale of the Property would be consummated *only* through a signed agreement of sale. Nevertheless, Plaintiff argues that the email exchanges between the parties' real estate agents, Weiss and Laiter, created a binding contract. There is no dispute that the Property was listed for sale with an asking price of $2,260,000.[90] On December 18, 2018, Laiter received the Letter of Intent with an offer from LC West Chester to purchase the Property from PL Real Estate at a price of $1,980,000.[91] Though the Letter of Intent was never signed by Mandara, Plaintiff contends that on January 7, 2019, Laiter, acting as Defendant's authorized agent, made a counteroffer to sell the Property at

---

[90]     Pl.'s Ex. P-1 at p. 2.

[91]     Pl.'s Ex. P-2 at p. 1.

the price of $2,150,000, and that Weiss accepted the offer on Colameco's behalf the following day.  Plaintiff further contends that the January 30, 2019 email exchanges between Weiss and Laiter created a binding contract for the sale of the Property at the price of $2,150,000, with a thirty (30)-day due diligence period and a thirty (30)-day closing period.  Plaintiff argues that later that same day, Laiter changed the terms of the offer through an email to Weiss by asking if Colameco would be willing to shorten the due diligence and closing periods, which Weiss immediately accepted.

These emails, however, do not create a binding contract, nor do they bind Plaintiff and/or Defendant.  Critically, the preponderance of the evidence establishes that there was no "meeting of the minds" or mutual assent to be bound.  *See Refuse Mgmt. Sys.*, 671 A.2d at 1146.  Neither Mandara nor Colameco intended or agreed that Weiss' and Laiter's email communications, as opposed to a signed formal document, would create a binding contract.  As noted, the credible trial testimony clearly establishes that Weiss, Laiter, Colameco, and Mandara each believed that their discussions regarding the Property would be consummated *only* through a signed agreement of sale.

The email exchanges between Laiter and Weiss, the real estate agents, indicate a shared interest and intent to effectuate the sale of the Property through a formal document, which would ultimately be signed by Colameco and Mandara.  With respect to the Letter of Intent and the draft agreements of sale, Weiss indicated that he and Colameco expected Mandara to sign the documents before any agreement would be official.  Pertinently, when sending Laiter the initial Draft Agreement of Sale on February 12, 2019, Weiss wrote, "I will have [Colameco] sign and send to you.  Can you get [Mandara] to sign[?]"  Weiss also noted that he would be sending a deposit to a

16

title company "*in hopes we get a signed agreement of sale.*"[92]  A few days later, Weiss asked Laiter, "Can we get a signed AoS [agreement of sale] back?"[93]  Subsequently, while sending Laiter the New Draft Agreement—which Colameco had signed—Weiss inquired whether the full asking price would "get [Mandara] to sign."[94]  Colameco was copied on this email, and Laiter forwarded the document to Mandara.  These communications clearly evince an expectation by Weiss and Colameco that a sale could not be complete until Mandara and Colameco both signed an agreement of sale.  In light of these facts, this Court finds that Plaintiff has not established that a contract existed. *See Krause*, 563 A.2d at 1186.  Indeed, Weiss testified that while negotiating with Laiter, he "expected" that any agreement regarding a sale of the Property would be reflected in a written agreement of sale signed by Colameco.[95]

Further, consistent with the expectation that a formal document would be executed, Laiter and Weiss testified that neither believed there was a binding contract between LC West Chester and PL Real Estate during their discussions.  In fact, they both believed that Mandara had not yet decided to sell the Property.  After Weiss submitted the New Draft Agreement to Laiter in early March 2019, Laiter asked Mandara, "Do you know if you are able to sell the property or not?"[96]  Clearly, Laiter's understanding at this point was that Mandara had not committed to selling the Property at all, let alone entered into a binding contract for its sale.[97]  This understanding was even

---

[92]     Def.'s Ex. D-8 at p. 1 (emphasis added).

[93]     Def.'s Ex. D-11 at p. 1.
[94]     Pl.'s Ex. P-18 at p. 1.

[95]     *See* TT1 142:15–23.

[96]     Def.'s Ex. D-16 at p. 1.

[97]     Laiter also testified that he never believed the parties had created a contract.  TT1 87:17–19.

evident in late February when Weiss asked Laiter about other bank properties: "*If your client decides not to sell* then we are looking at others."[98]   Weeks later, Weiss' email of March 19, 2019, to Laiter noted, "It looks like he [Mandara] just doesn't want to sell."[99]   Colameco testified that he believed Mandara was not interested in selling at the time Weiss sent this email.[100]

The trial testimonies of Colameco, Weiss, Mandara, and Laiter also reveal that no one—critically, Colameco and Mandara—believed there was a valid agreement at any point prior to the filing of this lawsuit, despite Plaintiff's claims to the contrary.   Though Plaintiff contends that a binding contract for the sale of the Property existed as of January 7, 2019, and that a new contract, *albeit* unsigned, was created on January 30, 2019, Weiss' testimony that, in February, he submitted a new offer to buy the Property at the full $2.26 million asking price on Colameco's behalf because Weiss "did not feel that I had enough of an agreement that I could go to court on"[101] belies that contention.   This statement is consistent with Weiss' March 19, 2019 email to Laiter, in which Weiss noted that it seemed like Mandara did not want to sell the Property.[102]   Weiss' trial testimony and the February offer by Colameco clearly indicate that Colameco did not believe that there was a binding sale agreement as of January, as now argued.   Likewise, Laiter testified that he never believed the parties had reached a binding, enforceable agreement.[103]   Finally, Mandara's repeated instructions to Laiter to "hold off" (meaning to hold off on further negotiations), coupled with his testimony about his concerns regarding prepayment penalties and his ability to do a § 1031

---

[98]     Def.'s Ex. D-14 at p. 1.
[99]     Def.'s Ex. D-18 at p. 1.

[100]    TT1 183:7–9.

[101]    *Id.* 158:8–13.

[102]    Def.'s Ex. D-18 at p. 1.

[103]    TT1 87:17–19.

exchange, support the conclusion that Mandara had not accepted any of the offers and therefore did not believe that a binding contract existed.[104]

Importantly, Plaintiff and Defendant never agreed on the essential terms of the agreement of sale. *See Krause*, 563 A.2d at 1186. Weiss admitted at trial that as of February 12, 2019—after the date at which Plaintiff claims a contract was formed—there were terms in the Draft Agreement of Sale that he had never discussed with Laiter. These undiscussed terms included, *inter alia*, provisions regarding fixtures and personal property, the seller's representations, maintenance and risk of loss, governing law and jurisdiction, default and termination provisions, and arbitration.[105] The only terms discussed by the agents—Laiter and Weiss—were the price, the due diligence period, and the closing period. Even assuming that these terms were the only "essential" terms to the agreement of sale, the record does not establish that Mandara—the only person authorized to bind PL Real Estate to a sale contract, as discussed *infra*—ever agreed to the terms discussed by Laiter and Weiss. Importantly, Mandara testified that he would never agree to sell Property without first having an attorney or accountant review the relevant documents;[106] further, Mandara did not have either his attorney or accountant review the Draft Agreement of Sale.[107] In fact, Mandara testified that he himself never reviewed or signed the Letter of Intent or either draft of the agreement of sale, nor did he ever speak to Colameco or Weiss regarding the sale of the Property.[108] In light of these facts, many uncontested, this Court concludes that Plaintiff has not

---

[104]     *See* TT2 12:22–13:5, 14:9–15.

[105]     TT1 73:15–74:17.

[106]     TT2 24:11–13.

[107]     *Id.* 24:3–10.

[108]     TT2 24:3–7, 19:15–24.

established by a preponderance of the evidence that Plaintiff and Defendant reached an agreement—a meeting of the minds—regarding the essential terms of a sale contract.  As the parties never reached a meeting of the minds, as evidenced by the actors' clear intent to enter a binding agreement *only* with a signed agreement of sale that was never formalized, this Court finds that Plaintiff has not proven by a preponderance of the evidence that a contract for the sale of the Property existed.

*Laiter's Authority to Bind Defendant to a Sale*

Notwithstanding the lack of a signed agreement of sale, Plaintiff also argues that Laiter had the authority (actual and apparent) to bind Defendant to a sale of the Property.  Plaintiff is mistaken.  The preponderance of the evidence does not support a finding that Laiter had any authority—actual or apparent—to bind Defendant to a contract.

Under Pennsylvania law, actual authority may be express or implied.  *Stout St. Funding LLC v. Johnson*, 873 F. Supp. 2d 632, 641 (E.D. Pa. 2012).  Express actual authority is expressly granted by a principal to an agent for a specific action, while implied actual authority includes "that which is necessary, proper, and usual in the exercise of the agent's express authority."  *Id.* (citing *Volunteer Fire Co. of New Buffalo v. Hilltop Oil Co.*, 602 A.2d 1348, 1352 (Pa. Super. Ct. 1992)).

Plaintiff relies on the Listing Agreement's provision titled "EXCLUSIVE RIGHT TO SELL" to support its argument that Laiter had actual authority to effectuate a sale of the Property. This provision expressly provides that Laiter had "the sole and exclusive right to market" the Property and "the exclusive right to negotiate such sale or exchange" and to receive a commission.[109]  While the heading reads "EXCLUSIVE RIGHT TO SELL," when taken in full

---

[109]    Pl.'s Ex. P-1 at p. 2.

context, it is unambiguous that the Listing Agreement did not grant Laiter any right to bind Defendant to a sale of the Property.  The Listing Agreement simply gave Laiter the authority to market and *negotiate* a sale of the Property and to receive a commission in the event of a sale. Laiter testified that he understood he had no authority to bind Defendant to a sale.[110]  As such, Laiter did not have the actual authority to sell the Property to Plaintiff on behalf of Defendant.

Plaintiff also contends that Laiter acted under apparent authority to bind Mandara.  An agent holds apparent authority to bind a principal when the principal "leads persons with whom his agent deals to believe that he has granted" authority to the agent.  *Stout St. Funding*, 873 F. Supp. 2d at 641 (quoting *Reading Co. v. Dredge Del. Valley*, 468 F.2d 1161, 1163 (3d Cir. 1972)). "A court may only find apparent authority if it is reasonable for the third party to believe that the agent is authorized in its actions."  *Id.*  Here, Mandara, as principal, took no actions and made no representations to Colameco or Weiss to lead them to believe Laiter had any authority to bind Defendant to a sale of the Property.  Indeed, Mandara never spoke with Colameco or Weiss before the negotiations fell apart.[111]  Moreover, the emails between Laiter and Weiss expressed an anticipation that Mandara would sign an agreement of sale.  Despite Plaintiff's arguments, Weiss understood that only Mandara, not Laiter, could finalize a sale, as evidenced by his repeated attempts to have Mandara sign an agreement of sale.[112]  Likewise, Laiter testified that he understood that the Listing Agreement only gave him the authority to market the property and negotiate a sale.[113]  Thus, Laiter did not have the apparent authority to sell the Property.  Only

---

[110]  TT1 23:25–24:3, 24:19–21, 50:5–8.

[111]  TT2 19:15–24.

[112]  Def.'s Ex. D-8 at p. 1 ("I will have [Colameco] sign and send to you. Can you get [Mandara] to sign[?]"); Pl.'s Ex. P-18 at p. 1 ("Attached is a full price offer.  Will that get [Mandara] to sign?").

[113]  TT1 23:25–24:3, 24:19–21, 50:5–8.

Mandara, as the owner and only manager of PL Real Estate, held such authority.  *See Nexgen Homes, LLC v. Form Process Eng'g, LLC*, 2011 WL 832892, at *3 (W.D. Pa. Mar. 3, 2011) (explaining that the sole member of an LLC was the only person with the authority to bind the company to a contract).

*Statute of Frauds*

Defendant also argues that Plaintiff's contract claim is barred by the Statute of Frauds.  It is well-established that under the Statute of Frauds, an agreement for the sale of real estate, like that at issue here, must be set forth in a writing signed by the parties.  33 Pa. Cons. Stat. § 1.  In some circumstances, an electronic signature may be valid under the Uniform Electronic Transactions Act of 2000 (the "UETA"), which Pennsylvania has adopted.  *See* 73 Pa. Cons. Stat. § 2260.305.  The UETA only applies, however, when the parties to the agreement have consented to conduct their transaction by electronic means.  *Id.* § 2260.301(b).  "Whether the parties agree to conduct a transaction by electronic means is determined from the context and surrounding circumstances, including the parties' conduct."  *Id.*

In this case, neither Plaintiff nor Defendant agreed to conduct the sale of the Property through electronic means, *i.e.*, email communications.  As noted, the actors involved in the negotiations repeatedly expressed their expectation that the transaction would be completed through a written agreement of sale signed by both parties.  Notably, Weiss and Laiter exchanged multiple email communications regarding the status of the two separate draft agreements of sale, which were never signed.  On this issue, the trial testimony established that when sending Laiter the Draft Agreement of Sale, Weiss wrote, "I will have [Colameco] ***sign and send to you****.* Can you get [Mandara] to ***sign***[?]"[114]  On a later occasion, Weiss specifically asked Laiter about getting a

---

[114]     Def.'s Ex. D-8 at p. 1 (emphasis added).

"signed" agreement.[115]  In his email submitting the New Draft Agreement to Laiter, Weiss asked if offering the higher price would "get [Mandara] ***to sign***."[116]  Colameco was copied on this email. Furthermore, Weiss testified that he "expected" that an agreement would be reflected in a "signed letter of intent followed by a signed written agreement of sale."[117]  Weiss even admitted that in his many years of real estate experience, he has never witnessed an arm's length transaction for the sale of real property accomplished electronically, without a formal agreement of sale signed by both parties.[118]  As for Mandara, there is simply no evidence that he consented to conducting a transaction electronically or discussed that possibility with Laiter; in fact, he never even spoke to Weiss or Colameco prior to this lawsuit.[119]  The preponderance of the evidence clearly demonstrates that Weiss, Laiter, Colameco, and Mandara all acted under the same assumption that a sale of the Property would be effectuated through a formal written and ink-signed document.

Absent any evidence that Colameco, Weiss, Mandara, or Laiter consented to conduct a sale of the Property by electronic means, this Court finds that the Uniform Electronic Transactions Act is inapplicable.  *See J.B.B. Inv. Partners, Ltd. v. Fair*, 182 Cal. Rptr. 3d 154, 165 (Cal. Ct. App. 2014), *as modified*, (Dec. 30, 2014) (holding that California's UETA did not apply where the parties exchanged email messages to negotiate the terms of a contract but the plaintiff did not demonstrate consent to conduct transactions electronically).

---

[115]    Def.'s Ex. D-11 at p. 1.

[116]    Pl.'s Ex. P-18 at p. 1 (emphasis added).

[117]    TT1 142:15–23.

[118]    *Id.* 142:24–143:18.

[119]    TT2 19:15–24.

Because Plaintiff has failed to establish by a preponderance of the evidence the existence of a valid and enforceable contract for the sale of the Property, Plaintiff is not entitled to specific performance of the sale, *see Oliver v. Ball*, 136 A.3d 162, 167 (Pa. Super. Ct. 2016) (explaining that a purchaser of real estate is entitled to specific performance where the seller has violated a valid contract for the sale of the real estate), or compensatory damages, *see Rose v. Rothrock*, 2009 WL 1175614, at *6 (E.D. Pa. Apr. 29, 2009) (citing *Empire Props., Inc. v. Equireal, Inc.*, 674 A.2d 297, 301 (Pa. Super. Ct. 1996)) (explaining that a purchaser of real estate may only recover compensatory damages if there exists a valid sale contract).  For the same reason, Plaintiff is also not entitled to damages under the "bad faith rule."[120]

**CONCLUSION**

For the foregoing reasons, based on the evidence of record, this Court finds that Plaintiff has failed to prove by a preponderance of the evidence that Plaintiff and Defendant entered into a valid and enforceable contract for the sale of the Property.  As such, Plaintiff has failed to substantiate its breach of contract claim.  Accordingly, judgment on all counts is entered in favor of Defendant PL Real Estate and against Plaintiff LC West Chester.  An Order consistent with this Memorandum Opinion follows.

*NITZA I. QUIÑONES ALEJANDRO*, J.

---

[120]     In addition to compensatory damages, Plaintiff claims it is entitled to damages under the "bad faith rule" due to Mandara's alleged bad faith throughout discussions regarding the Property and this lawsuit. Plaintiff is, however, mistaken.  Plaintiff claims that Mandara, *inter alia*, acted inconsistently during the sale negotiations, refused to corroborate certain testimony by Laiter, denied knowledge of Plaintiff's identity, and showed "egregious disregard" for the sale negotiation process.  (Pl.'s Proposed Findings of Fact & Conclusions of Law, ECF 37, at pp. 39–40).  There was no trial testimony regarding Mandara's alleged bad faith.  A buyer of property may be entitled to damages for loss of bargain as a result of a seller's failure to perform the sale in good faith.  *Baldassari v. Baldassari*, 420 A.2d 556, 562 (Pa. Super. Ct. 1980). However, this type of damages is available only when the seller has breached a valid written or oral contract. *See Seidlek v. Bradley*, 142 A. 914, 916 (Pa. 1928).  Because this Court has found that no contract for the sale of the Property existed and, consequently, no breach of contract occurred, Plaintiff cannot recover damages under this theory of liability.